**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-0671-WJM-GPG

PATRICIA CUERVO,

     Plaintiff,

v.

TODD SORENSON, Captain, Mesa County Sheriff's Office,
TRAVIS CHRISTENSEN, Sergeant, Mesa County Sheriff's Office,
MARCO MONTEZ, Sergeant, Mesa County Sheriff's Office,
TIM ORR, Sergeant, Mesa County Sheriff's Office,
JENNA REED, Investigator, Mesa County Sheriff's Office,
ERIC OLSON, Investigator, Mesa County Sheriff's Office,
CURTIS CALLOW, Deputy, Mesa County Sheriff's Office,
DONALD LOVE, Deputy, Mesa County Sheriff's Office,
SETH PARKER, Deputy, Mesa County Sheriff's Office,
THOMAS STUCKENSCHNEIDER, Deputy, Mesa County Sheriff's Office,
JOSH SANCHEZ, Deputy, Mesa County Sheriff's Office,
RYAN REASONER, Deputy, Mesa County Sheriff's Office,
GARTH COWLEY, Deputy, Mesa County Sheriff's Office,
SALMINEO ESPINDOLA, Deputy, Mesa County Sheriff's Office,
DEVRIN SANDELL, Deputy, Mesa County Sheriff's Office,
MIKE MILLER, Investigator, Mesa County Sheriff's Office, and
JAMIE PENNAY, Sergeant, Mesa County Sheriff's Office,

     Defendants.

---

**ORDER GRANTING MESA DEFENDANTS' AMENDED MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

---

     Before the Court is the Mesa Defendants'[1] Amended Motion to Dismiss Plaintiff's

---

[1] Captain Todd Sorenson, Sergeant Travis Christensen, Sergeant Marco Montez, Sergeant Tim Orr, Investigator Jenna Reed, Investigator Eric Olson, Deputy Curtis Callow, Deputy Donald Love, Deputy Seth Parker, Deputy Josh Sanchez, Deputy Thomas Stuckenschneider, Deputy Ryan Reasoner, Deputy Garth Cowley, Deputy Salmineo Espindola, Deputy Devrin Sandell, Investigator Mike Miller, and Sergeant Jamie Pennay are collectively referred to as "Defendants" in this Order.

First Amended Complaint ("FAC") Pursuant to Rule 12(b)(6) ("Motion").  (ECF No. 134.)

Plaintiff Patricia Cuervo filed a response to the Motion.  (ECF No. 137.)  Defendants

filed a reply.  (ECF No. 138.)  For the following reasons, the Motion is granted.

## I. BACKGROUND

### A.  Allegations in the FAC[2]

On the evening of March 11, 2018, Sergeant Tim Orr and Deputy Josh Sanchez

of the Mesa County Sheriff's Office ("MCSO") followed up for the Eagle County Sheriff's

Office on a report of a stolen 1982 Tucker Model 534-A Snow Cat ("Sno-Cat"), which is

a tracked vehicle with an overall length of 16' 3", width of 8', height of 7' 5", and weight

between 5,050 and 5,350 pounds.  (¶¶ 20–21.)  Sergeant Orr and Deputy Sanchez rang

the doorbell at 1867 S Deer Park Circle, Grand Junction, Mesa County, Colorado (the

"Property"), but they did not announce any authority to enter.  (¶ 20.)  No one answered

the door.  (*Id.*)

At 9:32 p.m., Deputy Devan M. Salazar of the Eagle County Sheriff's Office

obtained a search warrant to look for the Sno-Cat at the Property.  (¶ 25.)  Plaintiff

alleges that the search warrant authorized searching the Property for:

> [a] 1982 Tucker Model 534-A Sno-Cat with OHV Sticker
> 4081V / VIN #3823562.  The Sno-Cat is orange in color with
> the numbers 01 in black with white trim on each door. On the
> right rear side of the Sno Cat is a toolbox.  On the toolbox
> near the lock in blue lettering and while trim is the name
> "Mother Tucker".  On the bottom of the toolbox is a blue
> stripe with white stars.  The Colorado State flag is painted on
> the engine hood. There is a chrome placard on the right side
> of the engine hood with the words ["]Tucker SNO-CAT".

---

[2] The Background is drawn from the FAC.  (ECF No. 131.)  The Court assumes the
allegations contained in the FAC to be true for the purpose of deciding the Motion.  *See Ridge
at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  Citations to (¶ __),
without more, are references to the FAC.

(*Id.*)  Plaintiff adds an allegation to the FAC: "The toolbox is clearly a part of the Sno-Cat and the search warrant authorizes only the search for the Sno-Cat."  (*Id.*)

Allegedly, "Orr and . . . others" decided that the MCSO would execute the search warrant, with assistance from the Grand Junction Police Department ("GJPD") SWAT team.  (¶ 24.)  Plaintiff alleges that although law enforcement had a thermal imaging unit which would have confirmed that the only living heat source in the Property was a dog, at approximately 10:36 p.m., the SWAT team, under orders from the SWAT Team Leader and the Incident Commander, prepared to "hit" the residence by firing munitions into the structure.  (¶ 26.)  At 10:43 p.m., the GJPD SWAT officers were paged to assist, and at 11:46 p.m., they "mov[ed] in" to "assault the residence at [the Property]."  (¶ 27.)

Plaintiff alleges that although the search warrant did not comply with the requirements of a "no knock" warrant under Colorado law, Colo. Rev. Stat. § 16–3–303(4), the SWAT team did not "knock and announce."  (¶ 28.)  In addition, although there was no threat of physical force from anyone in the residence at the Property that would justify the use of physical force, including munitions, under Colo Rev. Stat. § 18–1–707, "numerous chemical shells were fired into the residence at [the Property] by the Defendants . . . ."  (¶¶ 29, 32.)

According to Plaintiff, "[n]o exigent circumstances supported the use of munitions to breach the premises at [the Property], to enter the residence, or to justify entry into spaces other than the garage to search for the Tucker Sno-Cat."  (¶ 23.)  Given the size of the Sno-Cat, Plaintiff alleges that the only opening in the exterior of the Property capable of permitting the entry of the described subject of the search warrant was the exterior double garage door connecting to the driveway.  (¶ 21.)  Plaintiff alleges that

"[l]aw enforcement did not have information that indicated that Jason Cuervo or anyone who may be located at [the Property] had ever resisted lawful orders from law enforcement," and that "[t]here was no justification for a protective sweep of the portion of the premises where the Sno-Cat could not have been located."  (¶¶ 30–31.) Nonetheless, Plaintiff alleges that Defendants "entered places in the residence where the Sno-Cat could not have been located."  (¶ 34.)

Plaintiff alleges that Captain Sorenson was the Incident Commander and was responsible for the directions given and information provided to officers, and under whose orders the munitions were fired into the residence.  (¶ 37.)  She also alleges that Sergeant Christensen was the SWAT Operations Supervisor and was responsible for the directions given and information provided to officers executing the search warrant, and under whose orders the munitions were fired into the residence.  (¶ 39.)

Plaintiff asserts nearly identical individual allegations against each Defendant, alleging:

> On March 11, 2018, [name of Defendant] participated in the SWAT execution of the Search Warrant for 1867 S Deer Park Circle in which unreasonable force was directed into the residence, including firing munitions into the residence. . . . [Defendant] entered and searched places where the Tucker Sno-Cat, which was the only subject of the search warrant, could not reasonably be expected to be found. . . . [Defendant] [fired, directed, or aided and abetted][3] the firing of munitions into [the Property].

(¶¶ 38–55.)  She alleges that the MCSO and GJPD's reports do not detail which of the Defendants entered beyond the garage at the residence at the Property, nor do they

---

[3] Plaintiff alleges that Sorenson and Christensen (¶¶ 38–40) may have "directed, fired, or aided and abetted the firing of munitions into [the Property]," whereas the other Defendants (¶¶ 41–55) merely "fired or aided and abetted the firing of munitions into [the Property]."

detail which Defendants launched chemical weapons into the structure or otherwise physically damaged the property.  (¶ 56.)  Additionally, Plaintiff alleges that "[o]n information and belief[,] each defendant did not sufficiently report their involvement in unreasonable execution of the search of the residence as part of an informal policy, to not adequately report an illegal search and seizure."  (¶ 57.)  Also "[o]n information and belief," Plaintiff alleges that "the execution of this search warrant was used as a training exercise to use tactics and tools that are not routinely used by the [MCSO] or the Grand Junction Police."  (¶ 58.)

Finally, she alleges that Defendants used excessive and unreasonable force in executing the search warrant and unlawfully entered areas not authorized by the warrant or exigent circumstances, resulting in actual damage to the structure and furnishings from the impacts and the hazardous chemicals.  (¶ 59.)  Defendants also allegedly did not secure the structure after their "raid" and left windows and doors unsecure, which resulted in the additional loss of property from looting.  (*Id.*)

Plaintiff alleges that

> [t]he absence of the after action report, mandated by the written policies of the Mesa County Sheriff's Office, as well as the absence of detailed reports of the participating officers, was, as evidenced by the utter failure of that absence to trigger an investigation, was part of an unwritten but clearly understood policy to escalate SWAT deployments far beyond the necessary use of force in order to provide training scenarios, while concealing the unnecessary and excessive destruction of private property from public view.

(¶ 62.)  As a result of each Defendant's actions, Plaintiff alleges that over $50,000 in damage was done to her home.  (¶ 60.)  She requests her reasonable costs and attorneys' fees, damages, and punitive damages.  (ECF No. 131 at 21.)

**B.     Documents Outside the Pleadings**

Although no party attached the search warrant and affidavit to the briefing in connection with the Motion, the Court considered both of these documents in its Order Granting Defendants' Motions to Dismiss ("First Dismissal Order").[4]  (ECF No. 70-2; ECF No. 113 at 5–9.)  As the Court concluded in the First Dismissal Order, the Court again finds that it need not convert the Motion into a motion for summary judgment to consider the search warrant and affidavit here.[5]

In the affidavit in support of the warrant, Deputy Salazar recounts that security footage from the parking lot where the Sno-Cat was last seen showed a truck pulling a trailer carrying the Sno-Cat.  (ECF No. 70-2 at 3.)  Further, in response to law enforcement posting photos of the stolen Sno-Cat on social media, various individuals reported seeing a tan Toyota Tacoma pulling a trailer with the Sno-Cat on it, covered with tarps.  (*Id.*)  One citizen reported seeing the trailer backed up to the garage at the Property, though she did not see the truck or the Sno-Cat.  (*Id.* at 4.)

Deputy Salazar conducted research in a law enforcement database and discovered the owner of the Property was Patricia Ann Cuervo.  (*Id.*)  Further, Deputy Salazar found a possible suspect to be Jason Donald Cuervo.[6]  Deputy Salazar also found a vehicle matching the description of the suspect vehicle (the tan Toyota Tacoma) registered to Jason Cuervo at the Property.  (*Id.*)  Later, Deputy Sanchez advised

---

[4] In the Motion, Defendants state they attached the warrant as Exhibit A, but the Court could not locate any attachment on the docket.  (ECF No. 134 at 3.)

[5] The Court incorporates by reference its reasoning and the authority cited to support its consideration of the search warrant and affidavit.  (ECF No. 113 at 5–6.)

[6] As the Court noted in its First Dismissal Order, Jason Cuervo is undisputedly Plaintiff's son.  (ECF No. 113 at 7 n.6.)

Deputy Salazar that the trailer was backed up to the garage and was a 100% match to the stolen trailer in this case.  (*Id.* at 5.)  Sergeant Orr sent digital images to Deputy Salazar.  (*Id.*)

Sergeant Orr and his team attempted to make contact with the residents of the home but were unsuccessful.  (*Id.*)  In addition, Sergeant Orr advised someone was inside the residence but refused to answer the door.  According to Deputy Salazar, Sergeant Orr and state law enforcement would hold the residence as they waited for a search warrant.  (*Id.*)

On March 11, 2018, Judge Rachel Olguin-Fresquez of the County Court of Eagle County, Colorado, issued a search warrant, authorizing a search for the following described property:

> 1982 Tucker Model 534-A Snow Cat with OHV Sticker 4081V / VIN #3823562.  The snow cat is orange in color with the numbers 01 in black with white trim on each door.  On the right rear side of the Sno Cat is a tool box.  On the tool box near the lock in blue lettering and white trim is the name "Mother Tucker".  On the bottom of the tool box is a blue stripe with white stars.  The Colorado State flag is painted on the engine hood.  There is a chrome placard on the right side of the engine hood with the words "Tucker SNOCAT".
>
> Believed to be situated on the person, at the place, or in the vehicle known as:
>
> 1867 S Deer Park Circle, Grand Junction, Mesa County, Colorado
>
> The residence is an adobe single family home with a red Spanish tile roof.  The garage doors are painted brown with zero windows.  The roof of the home is a red tile roof. The numbers 1867 are located to the right of the second garage door below the outside light.  The front of the house faces east and the rear of the house faces west.

(*Id.* at 1.)

7

In addition, the FAC refers to "[r]eports provided by the Mesa County Sheriff's Office and the Grand Junction Police Department."  (¶ 56.)  In her response to the Grand Junction Motion in connection with the first round of motions to dismiss in this case, Plaintiff attached a one page After Action Report Completed by the Grand Junction Police Department Commander David Arcady (the "GJPD Report").  (ECF No. 105-3.)  Given that the Complaint specifically referenced the GJPD Report, Plaintiff *herself* attached the GJPD Report to her response, and no party disputed its authenticity, the Court determined in its First Dismissal Order that it could consider the GJPD Report without converting the motions to dismiss into motions for summary judgment.  (ECF No. 113 at 8.)  Here, the Court again concludes the same.

The GJPD Report explains:

> MCSO reported the residence was secured and the suspect Jason Cuervo . . . was believed to be barricaded in the residence.  A search warrant and arrest warrant was completed for the arrest of Plaintiff as well as stolen property (Snow Cat - stolen in Eagle County, CO. earlier in the day) by the Eagle County Sheriff's Department.

> MCSO Patrol Deputy advised they saw the male in the residence and he would not come to the door, then the deputy advised the location was locked down (meaning no one could come and go from the residence without being contacted).  MCSO advised the suspect was in the residence and had access to weapons with a significant criminal history rising to the level of SWAT.

> MCSO called for all the occupants to come out of the residence multiple times and it was audible to the rear of the residence where the GJPD SWAT team was holding positions on the back side of the residence.

(*Id.* at 2.)  Following deployment of chemical munitions into the structure and breach of the garage door, MCSO SWAT entered, but the suspect was not inside.  (*Id.*)

**C.     Procedural History**

On March 10, 2020, Plaintiff filed her Complaint, asserting two claims against all Defendants under 42 U.S.C. § 1983 for: (1) unreasonable search in violation of the Fourth Amendment, and (2) deprivation of property in violation of the Fifth Amendment. (ECF No. 1.)  On April 19, 2021, the Court entered the First Dismissal Order and dismissed Plaintiff's *Monell* claims without prejudice, her Fourth Amendment claim for unreasonable search against all Defendants in their individual capacities without prejudice, and her Fifth Amendment claim for deprivation of property with prejudice. (ECF No. 113 at 19.)  The Court also lifted the stay of discovery.  (*Id.* at 20.)

On November 17, 2021, United States Magistrate Judge Gordon P. Gallagher permitted Plaintiff to file an amended complaint.[7]  (ECF No. 130.)  On November 24, 2021, Plaintiff filed the FAC, in which she brought one claim for unreasonable search in violation of the Fourth Amendment against all Defendants, in their official and individual capacities.[8]  (ECF No. 131.)  Defendants filed the Motion, arguing that Plaintiff's claims against them in their individual and official capacities should be dismissed under Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 134.)

## II. LEGAL STANDARD

Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for

---

[7] Plaintiff's assertion in her response that the fact that Judge Gallagher allowed her to file the FAC means that he "apparently agree[s]" that she has cured all pleading deficiencies is absurd.  (ECF No. 137 at 4.)  Judge Gallagher's Order says no such thing.  In fact, he specifically states that given Rule 15(a)'s liberal standard, issues of futility and qualified immunity "would be better and more efficiently addressed after [the FAC] is filed and Defendants have had an opportunity to file another motion to dismiss[.]"  (ECF No. 130 at 6.)

[8] Plaintiff did not name Deputy Salazar or the members of the GJPD as Defendants in the FAC.

"failure to state a claim upon which relief can be granted."  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk*, 493 F.3d at 1177.  Thus, in ruling on a Motion to Dismiss under Rule 12(b)(6), the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).  However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).  "[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at

555).

## III. ANALYSIS

### A.    Official Capacity Claims

In the First Dismissal Order, the Court dismissed without prejudice all municipal liability claims, observing that the Complaint contained no allegations establishing municipal liability.  (ECF No. 113 at 11.)  In the FAC, Plaintiff again attempts to bring municipal liability claims by suing all Defendants in their official capacities.[9]

1.    Municipal Liability Standard

Section 1983 imposes liability on

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .

42 U.S.C. § 1983.  The Supreme Court held in *Monell v. Department of Social Services* that "person," as used in this statute, includes "municipalities and other local government units," more specifically, "local government units which are not considered part of the State for Eleventh Amendment purposes."[10]  436 U.S. 658, 691 & n.54 (1978).

A local government unit can be liable for damages under 42 U.S.C. § 1983 only

---

[9] Although Defendants raise the issue of whether Plaintiff has properly sued the municipality by suing law enforcement officers in their official capacities (ECF No. 134 at 7 n.6), because the Court finds that the *Monell* claims fail on their merits, it need not address this issue.

[10] The Eleventh Amendment reads, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Supreme Court construes this language to mean, among other things, that states may not be sued (even by their own citizens) for money damages in federal court.  *See Hans v. Louisiana*, 134 U.S. 1, 10–15 (1890).

when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.* at 694. The Supreme Court has thus "required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury," thereby "ensur[ing] that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality," rather than holding the municipality liable simply because it employed a constitutional wrongdoer. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997).

The relevant policy or custom can take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted; alterations incorporated). But, whatever species of policy or custom is alleged,

> [t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bryan County*, 520 U.S. at 404 (emphasis in original).

    2.    <u>Analysis</u>[11]

Defendants argue that Plaintiff has again failed to properly plead *Monell* claims,

highlighting that the FAC shows "no substantive changes" from the original Complaint.

(ECF No. 134 at 7–8.)  According to Defendants, Plaintiff has merely made "semantic

changes," all of which are insufficient to establish *Monell* liability.  (*Id.*)

In response, Plaintiff states that she "took to heart the Court's admonishment"

that the Complaint failed to allege *Monell* liability under any of the five methods

available in the Tenth Circuit.  (ECF No. 137 at 6.)  Her statement, however, rings

---

[11] In her response, Plaintiff avers that she has pled viable *Monell* claims under three theories, including decisions of employees with final policymaking authority, ratification by a policymaker of a subordinate employee's action, and failure to train or supervise employees. (ECF No. 137 at 7.)  She does not argue she has pled, or tried to plead, a *Monell* claim based on an informal custom amounting to widespread practice.  (*Id.*)

Despite the deficiencies of her response, the Court notes that it appears as though she attempted to plead a *Monell* claim based on an informal custom based on allegations in the FAC related to the fact that no after-action report was produced (¶ 36) or that "each defendant did not sufficiently report their involvement in unreasonable execution of the search of the residence as part of an informal policy[] to not adequately report an illegal search and seizure" (¶ 57).  She alleges that "[o]n information and belief, the execution of this search warrant was used as a training exercise to use tactics and tools that are not routinely used by the [MCSO] or the Grand Junction Police."  (¶ 58.)  Finally, she alleges that "[t]he absence of the after action report, mandated by the written policies of the Mesa County Sheriff's Office, as well as the absence of detailed reports of the participating officers, was, as evidenced by the utter failure of that absence to trigger an investigation, was part of an unwritten but clearly understood policy to escalate SWAT deployments far beyond the necessary use of force in order to provide training scenarios, while concealing the unnecessary and excessive destruction of private property from public view."  (¶ 62.)

Even construed generously, the Court concludes that to the extent Plaintiff attempts to plead informal custom amounting to widespread practice, these allegations on their face are insufficient.  As these allegations demonstrate, the FAC is devoid of *facts* concerning similar instances of Fourth Amendment violations committed by these Defendants or any other officers of the MCSO.  *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1290 (10th Cir. 2019) ("Mr. Waller's allegations—describing only one similar incident of excessive force prior to his own injuries—fall far short of plausibly alleging a 'widespread practice' of excessive force[.]").  Given these critical deficiencies in her pleading, Plaintiff cannot proceed on this theory of municipal liability.

hollow.  For support, Plaintiff cites *one* paragraph of the FAC that she argues establishes *Monell* liability and "invites the Court" to compare a similar paragraph from her previous Complaint with this paragraph in her FAC: "The incident commander, who was responsible for the directions given to officers and information provided to officers, **and under whose orders the munitions were fired into the residence**, was Defendant TODD SORENSON."  (¶ 137 (emphasis added by Plaintiff in her response, ECF No. 137 at 7).)

The Court accepted the invitation and compared the two paragraphs.  But Plaintiff goes no further.  She makes no further argument whatsoever and cites no case law demonstrating how paragraph 137 sufficiently states a claim for municipal liability. She does not even identify which theory she believes underpins this claim.

Instead, she merely makes one more statement: "[T]he straightforward assertions in the factual allegations in ¶¶ 20 through 60 of the *First Amended Complaint*, ECF 131, also demonstrate a policymaker's ratification of a subordinate employee's action and a failure to train or supervise employees."  (ECF No. 137 at 7.) She does not point the Court to which of these *forty paragraphs* she believes states a claim for municipal liability.  Again, Plaintiff makes no further argument and cites no case law.  Instead, she relies on the Court to review the forty paragraphs of her FAC, decide which paragraphs support any one of the five possible *Monell* theories, and determine whether they sufficiently state a claim.  She does not identify which defendant is the alleged policymaker (though from the allegations in paragraph 37, she believes it is Captain Sorenson), what action was ratified, and she provides no explanation as to her failure to train theory whatsoever.

The Court is "not charged with making the parties' arguments for them." *Meyer v. Bd. of Cnty. Comm'rs*, 482 F.3d 1232, 1242 (10th Cir. 2007); *Estate of McIntire ex rel. McIntire v. City of Boulder*, 61 F. App'x 639, 643 (10th Cir. 2003) ("It is not the responsibility of the court to search the record to find justification for representations made in the briefs.") (citations omitted).  Despite these significant shortcomings in her arguments, the Court analyzes the theories conclusorily advanced by Plaintiff.

a.    *Decisions of Employees with Final Policymaking Authority*

The Tenth Circuit has made clear that "if an official, who possesses final policymaking authority in a certain area, makes a decision—even if it is specific to a particular situation—that decision constitutes municipal policy for § 1983 purposes." *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995); *see Ireland v. Jefferson Cnty. Sheriff's Dep't*, 193 F. Supp. 2d 1201, 1226 (D. Colo. 2002) ("A single act of an employee may be imposed on a local governmental entity if the employee possesses final authority to establish policy with respect to the challenged action.").

 To determine whether an official is a "final policymaker," a court considers three factors: "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision[s] are final—*i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."  *Randle*, 69 F.3d at 448 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)) (quotation marks omitted).  Whether an individual "possessed such 'final authority' is a question of state law." *Jantz v. Muci*, 976 F.2d 623, 630 (10th Cir. 1992) (quoting *Ware v. Unified Sch. Dist. No. 492*, 902 F.2d 815, 817 (10th Cir. 1990)).

Plaintiff does not allege that Captain Sorenson or any other Defendant is a final

policymaker for MCSO; she alleges Captain Sorenson is an Incident Commander and Sergeant Christensen is a SWAT Operations Supervisor.  (¶¶ 37, 39.)  Further, Plaintiff has identified no facts from which the Court could determine whether Captain Sorenson, or any other Defendant in this case, is a final policymaker.  *See Rodriguez v. Payler*, 2020 WL 5026932, at *5 (D. Colo. Aug. 10, 2020), *report and recommendation adopted*, 2020 WL 5016927 (D. Colo. Aug. 25, 2020) (dismissing complaint and noting that "[t]o the extent these allegations even concern policy decisions, there are no facts from which to infer that Defendants held final policymaking authority as to the decisions purportedly rendered").

Moreover, Plaintiff has not even alleged facts from which the Court could determine that a final policy decision was made.  *See Payler*, 2020 WL 5026932, at *6. Ostensibly, she is arguing that law enforcement's decision to enter her residence and use munitions was a final policy decision, but she alleges no facts from which the Court might determine that to be the case.  To the extent such allegations concern policy decisions, there are no facts from which to infer that any given Defendant held final policymaking authority as to the decisions purportedly rendered.  For example, the FAC does not allege that Captain Sorenson or Sergeant Christensen were vested with exclusive, non-reviewable power to enter her residence and use munitions, or promulgate policies germane to that issue.  *See id.*  She does not allege that the municipality or the Sheriff or whatever individual who certainly has final policymaking authority (which is not alleged) delegated final policymaking authority to any Defendant.

Because Plaintiff has failed to allege facts upon which the Court could conclude that any Defendant had final policymaking authority or rendered a final policy decision,

the Court finds that Plaintiff has failed to state an official capacity claim under § 1983.

*See Payler*, 2020 WL 5026932, at *6; *Rodriguez v. Chavez*, 2014 WL 4627274, (D. Colo. Sept. 16, 2014) (granting a Rule 12(c) motion to dismiss official capacity claims under § 1983, based on the failure to adequately allege that the defendants had final policymaking authority); *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1207 (D. Colo. 2009) (dismissing official capacity claims, where the plaintiff failed to meet the federal pleading standard to show municipal liability).

       b.    *Ratification*

Under *Monell*, a municipality may be held liable if a final municipal policymaker ratifies the unlawful conduct or decision of a subordinate and the basis for the conduct or decision. *Sodaro v. City & Cnty. of Denver*, 2022 WL 4365983, at *12 (D. Colo. Sept. 21, 2022). There are simply no allegations in the FAC from which the Court could conclude a final municipal policymaker ratified the conduct alleged in the FAC. Plaintiff's statement in her response that she has pled facts demonstrating "a policymaker's ratification of a subordinate employee's action" is wholly conclusory. (ECF No. 137 at 7.) She identifies no paragraphs in the FAC supporting a ratification theory. (*Id.* at 6–7.) She cites no case law in support of a ratification theory.

Based on her conclusory statements and for all of the reasons stated above, *see supra* Part III.A.2.a, the Court also concludes Plaintiff has failed to state a *Monell* claim under a ratification theory.

       c.    *Failure to Train or Supervise*[12]

Under a failure to train claim, a plaintiff must ordinarily show a defendant had

---

[12] To the extent Plaintiff alleges a theory of failure to supervise, that theory is encompassed by her failure to train theory. *See Trujillo v. City & Cnty. of Denver*, 2017 WL

"actual or constructive notice that a particular omission in their [training] program caused [officials] to violate citizens' constitutional rights" and nonetheless chose to retain the program. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A plaintiff must prove that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably said to have been deliberately indifferent to the need" for additional training. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *see Whitewater v. Goss*, 192 F. App'x 794, 797 (10th Cir. 2006) (recognizing that claims for failure to supervise are treated under the same deliberate indifference standard).

In her response, Plaintiff states that the allegations of the FAC demonstrate a failure to train or supervise employees. (ECF No. 137 at 7.) She identifies no specific paragraphs in the FAC that allege failure to train and cites no case law in support. (*Id.*) Upon review of the FAC, the Court finds that Plaintiff has made no specific factual allegations concerning the MCSO's training program, inadequate or otherwise. *See Zartner v. City & Cnty. of Denver, Colo.*, 242 F. Supp. 3d 1168, 1173 (D. Colo. 2017) (dismissing a *Monell* claim for failure to train, in part, on that basis); *see also City of Canton*, 489 U.S. at 390–91 ("In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors

---

1364691, at *4 (D. Colo. Apr. 14, 2017) ("The latter theory (inadequate discipline/supervision) falls under the general rubric of 'failure to train.'"); *Estate of Reat v. Rodriguez*, 2014 WL 4358333, at *2 n.4 (D. Colo. Sept. 3, 2014) ("Allegations of inadequate discipline and/or supervision are treated as failures to train . . . .").

other than a faulty training program.").

Nor has Plaintiff set forth any facts regarding how Defendants were trained, who they were trained by, or why their training was deficient. *See Sanchez v. City of Littleton*, 2020 WL 5815913, at *11 (D. Colo. Sept. 30, 2020) (dismissing a *Monell* claim for failure to train and/or supervise on that basis); *Bark v. Chacon*, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011) (dismissing a municipal liability claim, where the plaintiff "generally allege[d]" that the individual defendants were not properly trained, but had not "allege[d] specific deficiencies in training and supervision, or explain[ed] how the incident described in the Amended Complaint could have been avoided with different or better training and supervision"); *Rehberg v. City of Pueblo*, 2012 WL 1326575, at *5 (D. Colo. Apr. 17, 2012) (dismissing a municipal liability claim, where the complaint did not allege specific facts concerning the officers' training, and did not identify individuals that allegedly failed to supervise or train).

Notably, the FAC alleges no pre-existing pattern of violations.  In the excessive force context, the Tenth Circuit has stated that although "a single incident of excessive force can establish the existence of an inadequate training program," there still must be sufficient factual allegations regarding "the program's inadequacy" to establish municipal liability.  *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003).  On this record, the Court finds that Plaintiff has not alleged a viable municipal liability claim for failure to train or supervise.

Plaintiff was previously grated leave to amend her *Monell* claims.  (*See* ECF No. 113.)  In view of her second failure to properly allege these claims, the Court finds that it would be inequitable to allow Plaintiff a third bite at the apple, requiring Defendants to

once again incur substantial attorney's fees and costs in having to address a Second Amended Complaint.  *See Nat'l Ass'n of Invs. Corp. v. Bivio, Inc.*, 2013 WL 316021, at *8 (D. Colo. Jan. 28, 2013) (dismissing Sherman Act claims with prejudice after plaintiff's second failure to properly plead the claims).  Because Plaintiff has failed to state a *Monell* claim under any theory for the second time, the Court dismisses her claims against Defendants in their official capacities with prejudice pursuant to Rule 12(b)(6).

**B.    Individual Capacity Claims**

Defendants argue that Plaintiff's claims against them in their individual capacities are barred by qualified immunity.  (ECF No. 134 at 8–9.)

1.    Qualified Immunity Standard

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law."  *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (internal quotation marks omitted).  "Once the qualified immunity defense is asserted," as Defendants have done here, "the plaintiff bears a heavy two-part burden to show, first, the defendant[s'] actions violated a constitutional or statutory right, and, second, that the right was clearly established at the time of the conduct at issue."  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).  "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity."  *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 211 (2017).  "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"In this circuit, to show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Gutierrez*, 841 F.3d at 900 (internal quotation marks omitted).  "A plaintiff need not show the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Id.* (internal quotation marks omitted).  But "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it." *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted).

"The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Therefore, a plaintiff may not defeat qualified immunity "simply by alleging violation of extremely abstract rights." *White v. Pauly*, 137 S. Ct. 548, 552 (2017).  Nonetheless, the clearly established inquiry "involves more than a scavenger hunt for prior cases with precisely the same facts.  The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citation omitted).

Because qualified immunity is immunity from suit, rather than a mere defense to liability, *Estate of Reat,*, 824 F.3d at 964, a court may dismiss the case with or without prejudice if it finds that a defendant is subject to qualified immunity.  *Lybrook v.*

*Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1342 (10th Cir. 2000).

    2.   <u>Analysis</u>

Plaintiff brings a Fourth Amendment claim against Defendants arising from the allegedly unreasonable search of the residence at the Property, which she alleges damaged the real property.  (¶¶ 62–63.)  The Court will assume, for purposes of this Order only, that Plaintiff has adequately pled a Fourth Amendment claim arising from Defendants' search of the Property.

In its First Dismissal Order, the Court emphasized "the weakness of Plaintiff's Fourth Amendment claim against Defendants that has been brought out in the Rule 12 motion practice," particularly the allegations of personal participation.  (ECF No. 113 at 13.)  While the Court still has similar reservations about whether Plaintiff has successfully alleged personal participation, having assumed that Plaintiff has stated a Fourth Amendment claim, the Court turns to whether she has also satisfied the second prong of the qualified immunity analysis: whether the constitutional right was clearly established at the time of the Defendants' allegedly unlawful conduct.

Defendants argue that Plaintiff has again failed to demonstrate that they acted in contravention of clearly established law in conducting the search of her property.  (ECF No. 134 at 9.)  They contend that the FAC "contains no non-conclusory factual support for Plaintiff's contention that [they] acted unreasonably or unconstitutionally in executing a valid search warrant."  (*Id.*)  And even if the Court could infer a constitutional violation from the "scant facts" alleged in the FAC, Defendants argue that "Plaintiff cannot establish that the Mesa Defendants' actions in 'fir[ing] or aid[ing] and abet[ting] the firing of munitions' to clear a home where a felon was believed to be hiding, and in execution of valid search and arrest warrants, was excessive, unreasonable, or otherwise

22

prohibited by clearly established law."  (*Id.*)

In response, Plaintiff merely states, in a patently conclusory manner, the following: "In this case[,] the Defendants are alleged to have violated a federal constitutional right, and the right was clearly established at the time of [their] unlawful conduct . . . .  Therefore, qualified immunity does not apply."  (ECF No. 137 at 7.)  The only other paragraph in her response related to qualified immunity generically explains the well-established proposition that searches must be reasonable under the Fourth Amendment.  (*Id.*)  None of Plaintiff's case law citations contain explanatory parentheticals, even though the Court explicitly directed her to do so in the First Dismissal Order.  (ECF No. 113 at 16 n.11.)  In sum, Plaintiff does not analyze qualified immunity as it relates to the facts of her case.

Nonetheless, the Court has reviewed all of the cases Plaintiff cites to determine whether any satisfy the second prong of the qualified immunity analysis.  *See United States v. Ramirez*, 523 U.S. 65, 71 (1998) (police broke a window entering a home to search for a prison escapee with a violent past who reportedly had access to a large supply of weapons);[13] *Dalia v. United States*, 441 U.S. 238, 258–59 (1979) (concluding that the Fourth Amendment does not require that a Title III electronic surveillance order include a specific authorization to enter covertly the premises described in the order); *Peay v. Murphy*, 397 F. App'x 469 (10th Cir. 2010) (dismissing appeal for lack of interlocutory jurisdiction);[14] *Lawmaster v. Ward*, 125 F.3d 1341, 1349–50 (10th Cir.

---

[13] In the First Dismissal Order, the Court distinguished *Ramirez* from this case in its qualified immunity analysis.  (ECF No. 113 at 16–17.)  It is unclear why Plaintiff chose to cite it again without grappling with the Court's analysis in the First Dismissal Order.

[14] Defendants point out that the portion of *Peay* that Plaintiff cites in her response is an excerpt from a brief filed by the plaintiff in the lower court and is not part of the Tenth Circuit's

1997) (finding that the agents' conduct of leaving Lawmaster's gun in a dog's water bowl and leaving cigar and cigarette ashes in his bedding was not reasonably necessary to carry out the warrant's purpose to search for and seize a machine gun and parts).  While "the facts of the cases compared need not be identical," such conduct as described in these cases is not "sufficiently analogous to satisfy the particularized context necessary to support liability."  *Mecham v. Frazier*, 500 F.3d 1200, 1206 (10th Cir. 2007).  Even when reviewed generously, the Court finds these cases do not make "the unlawfulness of the officers' actions apparent."  *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011).

In sum, the facts of the cases Plaintiff cites in her response do not analyze the constitutionality of the alleged destruction of property by munitions during law enforcement's attempts to find stolen property, and simultaneously do a protective sweep to locate a suspect—here, Jason Cuervo—believed to be on the property. Plaintiff ignores the fact that the affidavit in support of the warrant and the GJPD Report demonstrate that law enforcement believed that Jason Cuervo or some other unknown individual was in the home at the Property at the time of the search, necessitating a protective sweep.  (ECF No. 70-2 at 5; ECF No. 105-3 at 2.)  The GJPD Report, as noted above, states that MCSO advised GJPD that the "suspect was in the residence and had access to weapons with a significant criminal history rising to the level of SWAT."  (ECF No. 105-3 at 2.)  Plaintiff does not address these facts, which are highly pertinent to the necessity of a protective sweep.

Plaintiff added three allegations seemingly intended to address the need for a

---

opinion.  (ECF No. 138 at 6 n.2.)

protective sweep:

> 29. At no time was there any indication of any threat of physical force from anyone in the residence at 1867 S Deer Park Circle against anyone such as to justify the use of physical force, including munitions, under § 18-1-707, C.R.S., 2017.
>
> 30. Law enforcement did not have information that indicated that Jason Cuervo or anyone who may be located at 1867 Deer Park Circle had ever resisted lawful orders from law enforcement.
>
> 31. There was no justification for a protective sweep of the portion of premises where the Sno-Cat could not have been located.

(¶¶ 29–31.)  However, these allegations are all conclusory.  Plaintiff alleges no facts to support these statements.  *See Maryland v. Buie*, 494 U.S. 325, 334 (1990) (law enforcement may conduct a "protective sweep" of a residence without a separate search warrant and without probable cause or reasonable suspicion if officers have a reasonable belief the protective sweep is necessary for safety); *U.S. v. Kaylor*, 877 F.2d 658, 664 (8th Cir. 1989); *U.S. v. Brown*, 217 F.3d 605 (8th Cir. 2000); *U.S. v. Barker*, 27 F.3d 1287 (7th Cir. 1994); *U.S. v. Mendoza*, 333 F. Supp. 2d 1155, 1159 (D. Utah 2004)).)

Because Plaintiff has not identified Tenth Circuit or Supreme Court case law that demonstrates that Defendants violated a clearly established right in conducting the search of her property, she has not met her burden to overcome the defense of qualified immunity.  For the reasons stated above, the Court declines to give Plaintiff a third opportunity to properly plead a Fourth Amendment violation.  *See supra*, Part III.A.2.c.  Accordingly, Plaintiff's Fourth Amendment claims against Defendants in their individual capacities are also dismissed with prejudice.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     The Mesa Defendants' Amended Motion to Dismiss Plaintiff's First Amended

Complaint Pursuant to Rule 12(b)(6) (ECF No. 134) is GRANTED;

2.     The First Amended Complaint (ECF No. 131) is DISMISSED WITH PREJUDICE;

3.     The Clerk shall enter judgment in favor of Defendants and against Plaintiff;

4.     The parties shall bear their own attorney's fees and costs; and

5.     The Clerk shall terminate this action.

Dated this 4th day of October, 2022.

BY THE COURT:

William J. Martinez
United States District Judge